18, 1171 Selgene v. Peter, so Mr. Konstantopoulos, we're just trying to, maybe we can curtail or not touch the constitutional question here. I don't plan to touch the constitutional issue because I think we've had a thorough ventilation of it, unless there are any further questions that we haven't taken care of. So we turn now to the 501 patent, which is on the original steps program. We say that the board's principal error here was in its misreading of the Powell reference. In particular, its reference to, quote, no effects on male sperm are recognized. The board said that this reference referred to contraceptive effects. Neither party argued this. No expert said that. The board made it up on its own. But that wasn't the exclusive basis for the board's reliance, right? They relied on the expert testimony and his reference to Nan and the prior art in existence of the time it's establishing. Right, and of course, the obviousness analysis has to take account of the entirety of the prior art. And that goes exactly to why this error requires reversal. So you think Powell's a teaching away? Powell comes very close to teaching away. But at the very least, what Powell is, is a more contemporaneous, it's a 1994 reference. It postdates Mann by 30 years. Yet under this court's decisions, and Leo Pharmaceuticals is a good example, when there's that sort of gap, and the more recent actual prior art. By the way, remember, Mann is not actually a prior art reference. It was just cited by the expert as being part of the broad general understanding of a person of ordinary skill. But by misunderstanding Powell, the board was able to take Powell and say, Powell doesn't have anything to do with this. In fact, the board called it significant. The board is actually significantly about Powell being limited to contraception in weighing the prior art. So at the very least, this ought to require a remand. But we do think that this error actually just demonstrates that CFAD didn't meet its burden, and that we should get our patent back. And if the court needs more information about why Powell was misread here, and we understand this is a substantial evidence standard, but we don't shrink from that here at all. Because substantial evidence still requires the board to have acted as a reasonable board would have in arriving at that decision. And we don't think that Powell can be read in any reasonable fashion as referring to contraceptive effects on men, not even ambiguously. And let's take, I'll take you through the document very quickly. This quote that was used by the board appears in a paragraph three of the patient information sheet. That paragraph three is entitled, in italics, Damage to Babies. The first sentence after that title is, this is very important for all women, considering thalidomide. That's at 326 of the appendix. It continues with toxicity to the developing baby. So it's talking about a pregnant woman. Damage to the baby, again. The need for adequate contraception to avoid conceiving a baby. And the command that taking thalidomide, quote, must stop if pregnancy occurs. It ends by saying, your doctor can advise you about adequate contraception. And then it adds, no effects on male sperm are recognized. So that you is the woman that is referred to at the beginning of paragraph three. Damage to babies, this is very important for all women. Now the rest of the article further underscores that this is the only reasonable reading of Powell. Page 324 of the appendix, paragraph three. Aren't you asking us to read out entirely that sentence relating to males? I'm sorry, Judge Rainey, I couldn't hear you. Aren't you asking us to read out entirely, to totally disregard that sentence regarding males? Oh no, in fact I want you to read that sentence regarding males. Because that sentence regarding males. Why shouldn't we read it in the context of the entire paragraph then? You should, absolutely. And that paragraph, and the context that's provided by that paragraph, is not talking about contraceptive effects of the drug on women or babies. It's talking about teratogenic effect of the drug on babies. And how to prevent those effects. And well, and it says that you need to be taking contraception. But then when it says no effects on male sperm are recognized, there's no question that that's referring not to the contraceptive effects of teratogenic effects of thalidomide. And if you have any doubts, Judge Rainey, look to the rest of the article. At 324, paragraphs 3D and E, it excludes patients, it excluded as patients, quote, women who wish to become pregnant. Now, it doesn't say there, men who wish to impregnate a woman. It talks about women of childbearing potential who are not, will not, or cannot take contraception. In paragraph five, it talks about women of childbearing potential who should agree to stop taking thalidomide immediately should they miss a period. On that same page 325 in paragraph six, it says women of childbearing potential who discontinue treatment with thalidomide should agree to take reliable contraceptive precautions for three months after discontinuing thalidomide. And Judge Rainey, to your point, if that sentence that the board said referred to contraception actually did, you would expect a sentence there saying, men do not need to worry about this because there is no effect on male spurt. And then under labeling F, finally, this is what it says at 327. Thalidomide causes serious damage to babies if taken by women during pregnancy. Not a mention of damage to babies if taken by men who inseminate a woman. Not one. That's not what this reference is about. It didn't disclose warning men. Yeah, but in the absence of that, we're left with the expert testimony, even though it predated this. And the studies in man that dealt with male sperm. Well, it dealt with rabbit sperm. Well, nobody's going to do a test on men. Well, that's right, but the article. We were stuck with animals. Well, you are stuck with rabbits, but you also have to take into account that man also says, and again, remember, man is just part of the ordinary understanding of the person of ordinary skill in this case. Which is what the expert said. Right, but man also says, this may not apply across species. There are substantial interspecies variations. So we have an ancient reference to rabbits. We have 30 years later, a reference that says, in no uncertain terms, no effects on male sperm. And of course, it sort of sounds funny to say this, but Powell was not a guidance for rabbits. Powell was a guidance for human beings. And the only human beings that it addressed were women. Every stage of Powell. Now, yes, if you eliminate Powell, you're left with it. But if you add Powell and say, well, Powell tells you that at least in 1994, the state of the art was, no effects on male sperm are recognized. Then the board's calculus in evaluating the entirety of the prior art is very different. Dr. Fuden didn't take any account of this statement in his declaration at all. He didn't. He simply said, here's man, and he says, man says this, therefore, that's in the prior art. That's part of the state of knowledge. He doesn't take into account the statement, and it's a very different record if the statement is part of the obviousness calculus. The board, by ignoring the arguments that have been made by the parties, completely eliminated giving any weight whatsoever to Powell by reading it in a way that made that statement irrelevant. The only other point I want to make on this, I'll leave the claim construction issue to the briefs unless you have questions. But with regard to the claim construction, the only thing I'd point you to is the discussion of Sloan, which couldn't be clearer that it's referring not only to centralizing information, but also centralizing the medium. And finally, the secondary considerations. The board gave incredibly short shrift to the secondary considerations here. The prior art, the programs for Accutane, the program from the VA, were nowhere near as effective as this one was. In Mitchell, which is the reference dealing with exposure to Accutane, there were 402 pregnancies. 402 pregnancies was nowhere near what could be allowed for Thalidomide. And this one took it down to zero. And Dishman, which was the Clozapine case involving the VA's program, had 3,300 adverse offense out of slightly under 100,000 prescriptions. Again, wildly unsatisfactory here. The board said, well, there were four exposures and no actual abnormalities here, and said that's not enough. That's pretty much like Dishman and Mitchell. That's not good enough. That gives secondary consideration, which this court has said in cases like Transocean and others, is so important to bringing the real world of obviousness to bear on things. And the board simply refused to do that here. I think I've kept my promise, and I'm giving you back some time. May I please support? I will begin with the issue about the male patients. First, what the board. Is it fair to say, in your view, that the board misconstrued Powell? I actually think what the board recognized is that Powell is not clear. And I'll get to that, why I think it's unclear. But I think, first off, what the board found is that, looking to the evidence that it had before it, which was the food and declaration, it was the reference from Mann showing the effects in rabbits. And also, Coalition had pointed to Celgene, a study, I'm sorry, at 5297 of the record, they had pointed to the fact that Celgene, when it decided to counsel a male patient, was actually relying on those rabbit studies. So in terms of the rabbit to the human connection, Celgene was satisfied that that was a legitimate connection. But what the board said that I think is important is it said, at page 17 of the record, what the board says is that that isolated statement in Powell standing alone doesn't defeat the sufficiency of petitioner's evidence. So after it went through petitioner's evidence, it said, regardless of what Powell says, it doesn't defeat that other evidence. I think the court can simply stop there. We think that, basically, what the board found is that, given the other overwhelming evidence in support, that we didn't even really need to go look to Powell. But what it went on to say was that, even when we look to Powell, we think it's unclear. And I think what they're reading is actually not is a fair reading. Looking to Powell, as opposing counsel mentioned, the paragraph starts out. And this is at 326 of the record. The paragraph starts out by talking to damage to babies. But then it says, this is very important for all women. And I think that's exactly what opposing counsel said. It's directed to women. And it goes through and talks about contraception. And it gets to the end. And it says, no effect on males. Where are you reading from again? I'm sorry, page 326 of the record? Yes. And it's paragraph three. Yes. So it starts out, talks about damage to babies, then says, this is very important for all women. And as I think the opposing counsel mentioned, this is targeted to women. And it goes on. And the rest of the paragraph is talking about contraception. And then it finishes at the end by saying, there are no effects on male sperm are recognized. We're addressing women. We're not talking to male patients. We're talking to women. And what the board said, what this is saying to these women is that when you're taking thalidomide, that is not going to have a contraceptive effect against the male sperm. So if you're engaged in sexual activity, you're a woman, don't think that this thalidomide is going to kill the male sperms. That's not going to act as a contraception. And that was, I think, a fair reading of this sentence. But the sentence, no effects on male sperm are recognized, seems to say that the thalidomide will not have an effect on male sperm, does it not? Through the women. The sentence is targeted to women who are taking thalidomide, not to male patients, I think, as I think this opposing counsel would agree. It's targeted to women. It's not targeted to men. And saying anything about male patients, you shouldn't take it because it's going to affect your sperm. It's saying female patients, don't think that when you take it, this is going to have an effect on male sperm. We think that is a fair reading of what it says. We think it's, at any event, we think the sentence is very ambiguous. And we think that when there is more than one interpretation, that this court's cases like Jolly and Byer, Acton-Gazelle Shoppe, that we said in our brief at page 25, when there are multiple conclusions that the board's decision should be given deference. But beyond that, we also think that the board didn't actually need to get to that because it found that the other evidence was so overwhelming that this single statement in Powell was not sufficient to defeat that other evidence. And I just want to point out lastly that the article that they referred to about no effect, which was an article that was cited. It's not actually part of the record. But the article that opposing counsel referred to is cited in Mann, where they were trying to suggest that there would not be an effect, or you wouldn't know from animal to animal. And if you read the full sentence, it says, it is fully recognized that the results of experiments limited to one species of laboratory animals must not be taken as necessarily carrying a great weight and validity for humans. But it goes on to say, nevertheless, they serve as a useful monitoring device. And in that capacity, may alert the medical profession to the appropriative risk inherent in medication of the male with thalidomide. So I think it goes much further than that in suggesting that one should, based on the rabbit studies, think about counseling male patients, which is exactly what was the basis for Celgene deciding to counsel male patients was these rabbit studies. Well, sentences like that, that you don't necessarily infer a similar effect in humans from effects in animals show up all the time in these research papers, I suppose. I've certainly seen them. Certainly, it's not necessary, but it certainly would lead someone, as the article goes on to say, would lead one to be cautious and to certainly counsel patients, which is all that the claim actually requires. There's no step in there about actually even changing whether or not you administer the drug to male patients and simply counsel male patients about this potential effect. Turning now to the claim construction issue, I think that the board's decision was sound. It relied on the fact that there was no centralized in the claim. It relied on what is in the specification, which is open to. Well, your friend elided his discussion of claim construction, relying on the briefs. So I think maybe we should leave it at that. Well, he also talked about the prosecution history. And I don't think that the prosecution history is as clear as he says. And I think the board's decision explains that. Because in the prosecution history, it was talking about the Sloan reference and distinguished on the basis that it was directed to the internet, whereas their claim was to a computer-readable storage medium. And to the extent that it talked about centralizing information, that, as the board said, is not the same thing as a centralized computer-readable storage medium. Moreover, given the claims and the specification, there was more than evidence to support its construction. And it also went on to say it would be obvious even if you adopted cell-jance construction. Do you want to say anything about the secondary considerations? Yes, with respect to secondary considerations, I think it's important to look to what was actually at issue before the board. And their evidence was about 3 and 1 half pages. And it begins at 3864 to 3868. And so the evidence that they presented before the board was all addressed by the board. And their arguments were principally about, well, with respect to the unexpected results, which is what opposing counsel seems to be focused on, all that was said was that the Stubbs method was 100% effective. And the board addressed that and said it was an unsupported assertion. In fact, that's true. The two experts simply relied, again, on this sentence or conclusory sentence by cell-jance representative, Mr. Freeman. And then secondly, the board noted that this other study, which had been submitted by coalition, there was a study by Boyer that indicated that there were actually four confirmed fetal exposures. And the board said that is actually what the claim is directed to. So given that, this statement, this conclusory statement about zero birth defects, the board said that would give it little weight because it's not actually what is claimed. But this whole notion of these other evidence that he is discussing, the 402 pregnancies and the 3,300 adverse effects with Dishman, those were not figures that were here in the brief before the board. Those were, I think, I don't even think the 3,300 adverse effects was in the brief at all. They mentioned in the background section about the 402 pregnancies in Mitchell, but it wasn't in part of their brief discussing the unexpected results. Moreover, we addressed that in our brief. We're comparing apples and oranges here. What's at issue is the number, what's claimed is the number of fetal exposures. And these pregnancies, first of all, the percentage in both of these is extremely small when you look at the percentage and not the absolute numbers. They're much below 100%. We've addressed this in our brief. And moreover, in Mitchell, yes, there were 402 pregnancies, but you can't compare that to the four fetal exposures. Those are different things. And in effect, in Mitchell, what they said was the vast majority of those women aborted their pregnancies. And then they talked about the very small, I think, one fetus that had some abnormalities, or one with major abnormalities and six with minor abnormalities. So these numbers that they're presenting here are a red herring. And similarly with Dishman, the numbers that they're comparing are just different. They're just looking at different things. So I will leave it at that, unless the court has any additional questions. Thank you. Thank you. We ask the court to adjourn. Thank you. The entirety of the board's treatment of the Powell reference is at the bottom of page 17 in a single paragraph. It's appendix 0017. My friend said that the board made alternative holdings here. You can't find it. The board did not say, regardless of whether this is the reading of this statement, my friend said to you, this is basically what the court found. I wrote down her words verbatim. That is not basically what the court found. My friend said that this is unclear, and the board found it unclear. You won't find the word unclear or any of its synonyms here. The closest you get is an isolated statement, but that doesn't say it's unclear. In fact, the board quite clearly says in the last sentence of this paragraph how it read Powell. My friend says this was a fair reading of Powell. If it was a fair reading of Powell, CFAD's expert didn't come up with it. CFAD didn't come up with it. Our expert certainly didn't come up with it. The board made it up. It's not inappropriate. It's not a fair reading. It's not an ambiguous reference at all in this regard. On the question of secondary considerations, we relied both on unexpected results and long felt need. The comment about the conclusory sentence by a Celgene representative, we answered that in our reply brief. I'd also add that the board never questioned the veracity of the figures given there. And with regard to the final comments made by my friend about Celgene never relying on the numbers that the Accutane and Clozapine references, that's wrong. Particularly Clozapine is the Dishman reference at A38, 19, and 20. That's in the background section of the patent donor's response. And then that section is referred to in the argument on secondary considerations. So the notion that we didn't make this argument before the board is demonstrably incorrect. We urge this board, this court, we now know the difference, to reverse. Thank you. Thank you. We thank both sides. I think I neglected to say it at first, but both the prior appeal and this one are submitted. Thank you.